IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | |
|---|---|
| Brenda Gail Cutro, # 212971, | C/A No. 1:16-cv-2048-JFA |
| Petitioner, | |
| vs. | |
| Bryan Stirling, *Commissioner, South Carolina Department of Corrections*; and Marion Bouleware, *Camille Graham Correctional Institution*, | **ORDER** |
| Respondents. | |

## I.     INTRODUCTION

Brenda Gail Cutro[1] ("Petitioner) filed this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 against Bryan Stirling, Commissioner of the South Carolina Department of Corrections, and Marion Bouleware, Warden of the Camille Graham Correctional Institution ("Respondent").[2] ECF No. 1. This matter is before the Court upon recommendation by the Magistrate Judge that Respondent's motion for summary judgment should be granted. ECF No. 15.

## II.     FACTUAL AND PROCEDURAL BACKGROUND

Petitioner is a South Carolina Department of Corrections ("SCDC") inmate incarcerated at the Camille Graham Correctional Institution. ECF No. 2. On June 20, 2016, Petitioner filed a petition for writ of habeas corpus. ECF No. 1. On July 1, 2016, Respondent filed a motion for

---

[1] Brenda Gail Cutro divorced her husband in 2011 and has resumed her maiden name, Hallman; however, due to "her appellate history and for ease of reference," she has elected to be referred to by her married name in these proceedings. ECF No. 1 at 6.

[2] On June 22, 2016, the Magistrate Judge ordered the Clerk of Court to terminate Bryan Stirling as a party to this action because a prisoner's custodian is the proper respondent in a habeas corpus action. ECF No. 6 (citing *Rumsfeld v. Padilla*, 542 U.S. 426, 434–35 (2004)). Thus, Bryan Stirling is no longer a party to this action.

summary judgment and return with a memorandum of law in support. ECF Nos. 8–9.  On August 1, 2016, Petitioner filed a timely response.[3] ECF No. 13.

In accordance with 28 U.S.C. § 636(b) and Local Civil Rule 73.02(B)(2)(c), D.S.C., the case was referred to the Magistrate Judge.[4] On November 1, 2016, the Magistrate Judge issued a Report and Recommendation ("Report") wherein she recommends this Court should grant Respondent's motion for summary judgment. ECF No. 15.  The Court is charged with making a de novo determination of those portions of the Report to which specific objection is made, and the Court may accept, reject, or modify, in whole or in part, the recommendation of the Magistrate Judge, or recommit the matter to the Magistrate Judge with instructions. *See* 28 U.S.C. § 636(b)(1).  In the absence of specific objections to the Report of the Magistrate Judge, this Court is not required to give an explanation for adopting the recommendation. *See Camby v. Davis*, 718 F.2d 198, 199 (4th Cir. 1983). The Report sets forth in detail the relevant facts[5] and standards of law[6] on this matter, and this Court incorporates those facts and standards without a recitation.

---

[3] Petitioner is represented by counsel, and, thus, an order pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), was not necessary. In addition, Petitioner requested an extension of time to file a response until August 1, 2016, which was granted by the Magistrate Judge. ECF Nos. 11–12. Thus, her response was timely filed.

[4] The Magistrate Judge makes only a recommendation to this Court. The recommendation has no presumptive weight, and the responsibility to make a final determination remains with the Court. *Mathews v. Weber*, 423 U.S. 261 (1976).

[5] The attachments to the return and memorandum are voluminous—amounting to almost 6,000 pages. The Court appreciates the Magistrate Judge's thorough review and makes the following minute changes to the Report: (1) the issues raised in Petitioner's final brief to the South Carolina Supreme Court are located at ECF No. 8-24 at 1–2 and the sixth issue is adjusted to reflect that the "appellant was entitled to have the jury charged under the facts of this case" (ECF No. 15 at 7) and (2) Judge Lee filed an order of dismissal on July 5, 2012, not October 21, 2013 (*Id.* at 8).

[6] The Court notes that the Report cites *Smith v. Murray*, 477 U.S. 527 (1986), on its fifteenth page. This citation is correct; however, for clarification, the short citations provided on the sixteenth and twenty-third pages of the Report should be to a similarly named opinion issued in the same year—*Murray v. Carrier*, 477 U.S. 478 (1986).

2

The parties were advised of their right to object to the Report, which was entered on the docket on November 1, 2016. ECF No. 15. The Magistrate Judge gave the parties until November 18, 2016, to file objections. *Id.* On November 15, 2016, Petitioner moved for an extension of time to file objections until November 25, 2016, which was granted by the Magistrate Judge. ECF Nos. 17–18. On November 21, 2016, Petitioner timely filed her objections to the Report. ECF No. 19. On December 5, 2016, Respondent timely responded to Petitioner's objections. ECF No. 20. Thus, this matter is ripe for the Court's review.

### III.     DISCUSSION

Petitioner raises four grounds on which she claims that she is being held in violation of the Constitution, laws, or treaties of the United States. ECF No. 1. The Magistrate Judge recommended that Grounds One and Three were procedurally barred and Grounds Two and Four warranted dismissal on the merits. ECF No. 15. Petitioner made four objections to the Report— one for each ground raised. ECF No. 19. The recommendations and objections will be discussed in accordance with the ground it was made upon.

#### A.  Ground One

Petitioner's first ground is:

The judge erred by denying trial counsel's motion for severance where the joinder of three separate offenses violated Petitioner's right to a fair trial and directly contradicted the South Carolina Supreme Court's holding in Petitioner's first trial that the State's evidence was "insufficient to establish [Petitioner] was the actor in [Child 1's] death or [Child 2's] injuries" and that the evidence of Child 1's death and Child 2's injuries was not admissible under the common scheme or plan exception. This improper joinder of offenses was not cured by the State's purported new motive of Munchausen's Syndrome by Proxy ["MSBP"], but instead, substantially prejudiced Petitioner and denied her right to due process of law as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution.

ECF No. 1 at 10–11 ("Ground One").[7] Regarding Ground One, the Magistrate Judge recommended it should be procedurally barred because Petitioner's final brief on direct appeal shows her argument on this issue was that the three indictments had been improperly joined under state law—not that joinder violated Petitioner's right to due process under the Constitution. ECF No. 15 at 19–20. Moreover, the Magistrate Judge recommended that Petitioner has not shown sufficient cause for the default and actual prejudice as a result of the alleged violation or that failure to consider the claim will result in a fundamental miscarriage of justice.[8] *Id.* at 23–24.

> Petitioner's entire objection consists of one paragraph, stating:
>
> With respect to Ground One, the R&R found that this claim was procedurally barred because it was not raised to the South Caroline Supreme Court in Petitioner's direct appeal. With all due respect to the Magistrate Judge's opinion, the dissent in the state court opinion specifically addresses the federal claim. This Court, therefore, should address the issue on the merits and find that Petitioner is entitled to relief.

ECF No. 19 at 1.

Respondent argues that "one brief reference, by the dissent, does not preserve a federal constitutional claim for habeas corpus review, when Petitioner failed to preserve the issue for state appellate review by . . . raising a due process argument in her brief." ECF No. 20 at 4.

Petitioner did not object to the Magistrate Judge's recommendation that Petitioner has not shown sufficient cause and prejudice or that a fundamental miscarriage of justice would occur if

---

[7] Petitioner's charges involved the deaths of two infants (labeled as "Child 1" and "Child 3") at her daycare center and injuries of another infant ("Child 2") allegedly sustained while in her care. The infants names are redacted in the briefs submitted to this Court; however, their names were published in the state court documents. In an effort to be consistent, this Court will refer to these infants as Child 1, Child 2, and Child 3. These incidents occurred on separate dates—January 4, 1993, June 23, 1993, and September 9, 1993—within a one year period and the indictments were joined by the trial judge. Petitioner was convicted of homicide by child abuse for the deaths of Child 1 and Child 3 and acquitted on the remaining charges.

[8] Although the Report's title for the subsection only reflects "Cause and Prejudice," the discussion also addresses Petitioner's failure to show a fundamental miscarriage of justice. *Id.* at 24.

the claim is not considered. Thus, the Court will only address whether Petitioner's due process claim was presented to the South Carolina Supreme Court, such that it should not be procedurally barred.[9]

> In her final brief on direct appeal, Petitioner stated the issue as follows:
>
> Whether the judge erred by permitting joinder of the [Child 1] and [Child 2] cases since the Supreme Court had already held that evidence regarding those two cases was not clear and convincing for purposes of State v. Lyle, and the state's request for joinder was a back-door effort to accomplish what the court had already held was impermissible, and the theory of [MSBP] was simply a red herring to justify joinder?

ECF No. 8-24 at 1. Throughout the argument in her final brief, Petitioner refers to the issue of joinder and character evidence. *Id.* at 28–36. Petitioner argued this issue and concluded, "The judge erred by allowing joinder, particularly since the [South Carolina] Supreme Court had already ruled that the state's evidence was insufficient to establish that [Petitioner] was the actor in [Child 1's] death or [Child 2's] injuries' and should not have been admitted." *Id.* at 33 (referencing *State v. Cutro*, 504 S.E.2d 324, 326-27 (1998) ("*Cutro I*")). However, *Cutro I* specifically involved whether Petitioner's actions toward the children were improperly admitted as prior bad acts under *State v. Lyle*, 118 S.E. 803 (S.C. 1923).

In ruling upon Petitioner's presented issue in *Cutro II*, the South Carolina Supreme Court noted this distinction by finding their evidentiary ruling in *Cutro I* regarding bad act evidence was not controlling, clarifying "in determining joinder, the trial judge need not find clear and convincing evidence of the charges," and holding all three charges were "properly tried jointly" because they were "similar in kind, place, and character" such that the charges "clearly fit within

---

[9] *See Makdessi v. Fields*, 789 F.3d 126, 131 (4th Cir. 2015) (quoting *United States v. Midgette*, 478 F.3d 616, 622 (4th Cir. 2007)) ("[T]o preserve for appeal an issue in a magistrate judge's report, a party must object to the finding or recommendation on that issue with sufficient specificity so as reasonably to alert the district court of the true ground for the objection. . . . Where an appellant has failed to preserve an issue, it is deemed waived.").

the *Lyle* categories for common scheme or plan and motive." *State v. Cutro*, 618 S.E.2d 890 (S.C. 2005) ("*Cutro II*"). Thus, the South Carolina Supreme Court did not view or address the issue presented to them as including a due process claim.

Moreover, the dissent's astute observation that, "[e]ven where joinder is permissible, the trial court must be mindful of protecting the defendant's right to a fair trial" does not excuse the fact that Petitioner did not present this claim in her brief nor did the majority address it in the opinion.

"If a habeas petitioner wishes to claim that [a] ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court." *Duncan v. Henry*, 513 U.S. 364, 366 (1995) (citing *Anderson v. Harless*, 459 U.S. 4 (1982)). The Supreme Court has "made clear that 28 U.S.C. s 2254 requires a federal habeas petitioner to provide the state courts with a 'fair opportunity' to apply controlling legal principles to the facts bearing upon his constitutional claim" and "[i]t is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state-law claim was made," but the "substance" of the federal claim must be presented. *Harless*, 459 U.S. at 6 (internal citations omitted). Furthermore, the United States Supreme Court has held "that ordinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material . . . that does so." *Baldwin v. Reese*, 541 U.S. 27, 32 (2004).

Here, Petitioner has only objected to the Magistrate Judge's recommendation that the claim is procedurally barred by stating that the claim was raised to the South Carolina Supreme Court because "the dissent in the state court opinion specifically addresses the federal claim."

ECF No. 19 at 1. Petitioner did not contest that her final brief to the South Carolina Supreme Court does not mention a federal claim for due process. Petitioner simply argues that "[i]t is clear that the [South Carolina Supreme] Court considered the federal claim" because the dissent stated, "Even if I were to find these charges were sufficiently connected so as to be subject to consolidation, I would hold that joinder should have been denied in order to protect [Cutro's] right to a fair trial." ECF No. 13 at 2 (quoting *Cutro*, 618 S.E.2d at 897 n.2). However, the dissent's position is not even acknowledged in the majority's opinion. A review of Petitioner's final brief and the majority's opinion in *Cutro II* reveals that Petitioner failed to present a federal due process claim and her citation to the dissent, without more, is insufficient to show the claim was fairly presented to or considered by the South Carolina Supreme Court such that it should not be procedurally barred.

Thus, Petitioner's first objection is overruled, and this claim is dismissed as the Magistrate Judge correctly recommended that it is procedurally barred and Petitioner has not shown cause and actual prejudice or a fundamental miscarriage of justice.

### B. Ground Two

Petitioner's second ground is:

> Appellate counsel provided ineffective assistance of counsel by failing to appeal a winning issue regarding the admissibility of an expert witness's testimony and opinion regarding [MSBP], where this evidence was unreliable and unscientific, and served as the basis for the judge's improper joinder of three separate offenses at trial. The admission of this evidence prejudiced the outcome of Petitioner's trial in violation of the Sixth and Fourteenth Amendments.

ECF No. 1 at 28 ("Ground Two"). Regarding Ground Two, the Magistrate Judge recommended that Petitioner could not satisfy the *Strickland*[10] test and failed to show the post-conviction relief ("PCR") court had unreasonably applied United States Supreme Court precedent or reached an

---

[10] *Strickland v. Washington*, 466 U.S. 668 (1984).

unreasonable factual determination given the evidence and record before it so Ground Two should be dismissed. ECF No. 15 at 30–31.

> Petitioner's entire objection consists of one paragraph, stating:
>
> With respect to Ground Two, the Magistrate Judge found that Petitioner cannot satisfy the *Strickland* test that appellate counsel rendered ineffective assistance of appellate counsel. Petitioner disputes the Magistrate Judge's finding that the [MSBP] testimony was admissible under the then-applicable *Council*[11] and *Jones*[12] standards. Petitioner's point is that the testimony was scientifically unreliable and therefore its admission violated her right to due process.

ECF No. 19 at 1. Respondent simply agreed with the Magistrate Judge's analysis of the claim. ECF No. 20 at 5.

Petitioner misses the point. Petitioner argues that "the testimony was scientifically unreliable and therefore its admission violated her right to due process"; however, under the *Council* and *Jones* standards[13] applicable during Petitioner's trial and appeal—2000 and 2005—this testimony's reliability may not have been relevant to its admissibility. Thus, the fact that "[n]owhere in the joinder issue did appellate counsel cite [SCRE] Rule 702, 703, [*Council*], [*Daubert*], [*Jones*], or any other case dealing with the admission of expert testimony or the concept of reliability" was not as "crucial" a mistake as Petitioner contends. ECF No. 1 at 39–40.

As late as 2007, the South Carolina Court of Appeals explained "not all expert testimony is subject to a *Jones* analysis." *State v. White*, 642 S.E.2d 607, 613 (S.C. Ct. App. 2007). It went on to state that the South Carolina Supreme Court had previously "distinguished an expert's

---

[11] *State v. Council*, 515 S.E.2d 508 (S.C. 1999) (evaluating admissibility of testimony from an employee at the F.B.I. laboratory regarding the results of mitochondrial DNA analysis performed on hairs).

[12] *State v. Jones*, 259 S.E.2d 120 (S.C. 1979) (evaluating whether admission of an expert opinion on "bite mark" evidence was inherently unreliable).

[13] *Council* stated "the admissibility of scientific evidence under the *Jones* standard" required evaluation of several factors, including: "(1) the publications and peer review of the technique; (2) prior application of the method to the type of evidence involved in the case; (3) the quality control procedures used to ensure reliability; and (4) the consistency of the method with recognized scientific laws and procedures." *Id.* at 517.

testimony that explained certain human behaviors from 'scientific' evidence, such as DNA test results, blood spatter interpretation, and bite mark comparisons." *Id.* In 2009, the South Carolina Supreme Court clarified "the analytical framework for the admissibility of nonscientific expert testimony" and held "that the trial courts of this state have a gatekeeping role with respect to all evidence sought to be admitted under Rule 702, *whether the evidence is scientific or nonscientific*." *State v. White*, 676 S.E.2d 684, 689 (S.C. 2009) (emphasis added).[14]

Here, the expert testimony—which Petitioner believes should have been excluded and its admissibility challenged—focused upon the medical diagnosis of MSBP and the behaviors exhibited that appeared to be consistent to support this theory. Thus, appellate counsel may have viewed it as an "expert's testimony that explained certain human behaviors," which was mentioned by the South Carolina Court of Appeals as nonscientific expert testimony not subject to the *Jones* analysis. It is evident that the trial judge relied upon this distinction as well stating, "You know, the inquiry the court makes has got to be different in considering evidence of something like [MSBP] than if you're considering something like the admissibility of DNA evidence." ECF No. 8-2 at 136. Therefore, it was not necessarily ineffective for appellate counsel to determine that Petitioner's proposed issue was not appropriate nor unreasonable or contrary to federal law for the PCR court to conclude appellate counsel was not ineffective.

---

[14] Specifically, the South Carolina Supreme Court stated the following holding in *Morgan* was an incorrect statement of law: "[i]f the expert's opinion does not fall within [the] *Jones* [standard for scientific expert testimony], questions about the reliability of an expert's methods go only to the weight, but not admissibility, of the testimony." *Id.* at 688 (quoting *State v. Morgan*, 485 S.E.2d 112, 118 (S.C. Ct. App. 1997)). It overruled *Morgan* to the extent "it suggest[ed] that only scientific expert testimony must pass a threshold reliability determination by the trial court prior to its admission in evidence." *Id.*

This decision appears analogous to the issue addressed by the United States Supreme Court in *Kumho Tire Co. v. Carmichael*, which clarified that "*Daubert*'s general principles apply to the expert matters described in [FRE] Rule 702" and the federal rule's "language makes no relevant distinction between 'scientific' knowledge and 'technical' or 'other specialized' knowledge." 526 U.S. 137, 147–49 (1999). Thus, the United States Supreme Court ruled that the trial court's gatekeeping role under the federal rules of evidence applied to all expert testimony—scientific and nonscientific. *Id.*

Moreover, "appellate counsel who files a merits brief need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal." *Smith v. Robbins*, 528 U.S. 259, 288 (2000) (citing *Barnes*, 463 U.S. 745 (1983)). Thus, "it is still possible to bring a *Strickland* claim based on counsel's failure to raise a particular claim, but it is difficult to demonstrate that counsel was incompetent." *Id.* The petitioner should show "that a particular nonfrivolous issue was clearly stronger than issues that counsel did present." *Id.* (citing *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986) ("Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome")). In addition, a prejudice analysis should be conducted. *Id.*

Petitioner makes much of the fact that her trial counsel, Beattie Butler, "felt strongly that the admissibility of [MSBP] should have been raised" on appeal and he testified to same at Petitioner's PCR hearing. ECF No. 1 at 41–43. However, even Butler admitted that he thought it was appropriate to defer to Petitioner's more experienced appellate attorneys—Joey Savitz and Bob Dudek. ECF No. 8-23 at 91, 101 ("I would defer to them as to what were the best grounds. I felt strongly the admissibility of [MSBP] should have been raised. They thought otherwise. . . . they didn't think it was as good of an issue as I thought it was."). As evidenced at the PCR hearing, Butler deferred to Savitz and Dudek, whom allegedly thought the admissibility issue regarding MSBP under Rule 702 was not as strong as the eight others that they raised on appeal. ECF No. 8-24 at 1–2. Notably, Savitz and Dudek did not testify at the PCR hearing to provide an explanation for their choices. ECF No. 8-23 at 243. Moreover, the trial judge's decision to join the cases did not rest solely on his consideration of MSBP, but he also considered other cases allowing joinder in South Carolina. *See* ECF No. 8-1 at 144–45. Therefore, due to the discussion

above, it was not necessarily ineffective for appellate counsel to determine that Petitioner's proposed admissibility issue was not the strongest argument to raise and decline to do so. Thus, the PCR court's conclusion was not unreasonable or contrary to federal law.

In her response to Respondent's motion for summary judgment, Petitioner argues that the "PCR court improperly denied relief because it found that appellate counsel did raise the issue of the admissibility of [MSBP]." ECF No. 13 at 4. Petitioner misinterprets the PCR court's order. The PCR court found "issues relating to MSBP were raised on appeal," which is correct—among the issues on appeal were whether the trial judge erred by permitting joinder or allowing memorabilia of the deceased children under the theory of MSBP. ECF Nos. 8-23 at 252; 8-24 at 1–2. The PCR court pointed to the trial court's ruling that the testimony regarding MSBP "would not be allowed to state that [Petitioner] did in fact suffer from MSBP; rather the evidence could be presented about the characteristics of MSBP and then the State could present evidence of what Petitioner did or did not do that would be reflective of the condition."[15] ECF No. 8-23 at 251. In addition, the PCR court recognized that the South Carolina Supreme Court addressed the issues of joinder and whether the MSBP evidence was improper and prejudicial. *Id.* The PCR court then went on to state that "[b]ecause the evidence was not admitted that she specifically had the condition, the scientific reliability was not critical. Further, MSBP has been recognized

---

[15] During the trial, the judge provided a limiting instruction regarding MSBP and stated:

> Ladies and gentleman, you are about to hear some testimony about [MSBP]. Now, this testimony is being admitted. And you can consider this testimony, considering [MSBP], only for the limited purpose or purposes of assisting you in considering the motive of the defendant if any, the plan of the defendant if any, the absence of illness, mistake, or accident if any. You may not consider evidence of [MSBP] if any as a substitute for proof that the defendant committed the crime or crimes charged, nor may you consider this testimony as proof that the defendant has a criminal personality if any or bad character if any, only for the limited purposes, for whatever weight you think it deserves in considering motive, plan, the absence of mistake, illness, or accident.

ECF No. 8-7 at 35–36.

by the medical and psychology community." *Id.* at 252; *see* ECF No. 8-2 at 1. Moreover, the PCR court stated, "Under the circumstances, given the manner in which MSBP was used at trial it was not ineffective not to specifically raise the Rule 702 issue on appeal. . . . Even if counsel was ineffective in failing to raise the specific issue on appeal, the Supreme Court held that the evidence was not prejudicial." *Id.* at 253.

Thus, the PCR court did not find that appellate counsel raised the specific issue of MSBP's admissibility under Rule 702; the PCR court simply found that other issues regarding MSBP had been raised and, furthermore, that appellate counsel was not ineffective for failing to raise the admissibility issue nor was this failure prejudicial to Petitioner.

In addition, "when a petitioner's habeas corpus claim is based on alleged ineffective assistance of counsel . . . . [t]he AEDPA standard and the *Strickland* standard are dual and overlapping, and we apply the two standards simultaneously rather than sequentially." *Richardson v. Branker*, 668 F.3d 128, 139 (4th Cir. 2012) (citing *Harrington v. Richter*, 562 U.S. 86 (2011)). "Because both standards of review are highly deferential to the state court's adjudication . . . , when the two apply in tandem, the review is doubly so.'" *Lee v. Clarke*, 781 F.3d 114, 123 (4th Cir. 2015), *as amended* (Apr. 15, 2015) (internal quotations omitted). "[F]ederal habeas relief may not be granted unless the state court's decision 'was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'" *Booth-El v. Nuth*, 288 F.3d 571, 575–76 (4th Cir. 2002) (explaining a state court's decision is contrary to clearly established federal law if it "applies a rule that contradicts the governing law set forth in [the United States Supreme Court's] cases" or "confronts a set of facts that are materially indistinguishable . . . and nevertheless arrives at a result different from its precedent" and is unreasonably applied if the state court "correctly

identifies the governing legal rule but applies it unreasonably to the facts" or "was unreasonable in refusing to extend the governing legal principle"). Alternatively, relief may be granted if the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

Pursuant to the discussion above and provided in the Report, Petitioner has failed to show that the state court's decision on Petitioner's claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

Therefore, Petitioner's second objection is overruled and Respondent's motion for summary judgment on Ground Two is granted.

### C.  Ground Three

Petitioner's third ground is: "The judge erred by forcing the jury to continue deliberating after it clearly informed the court on more than one occasion it could not reach a verdict and that three jurors would not change their vote. The forced deliberations resulted in a coerced verdict." ECF No. 1 at 45.

Regarding Ground Three, the Magistrate Judge recommended it should be procedurally barred because it was not fairly presented to the state court on direct appeal. ECF No. 15 at 20–22. Moreover, the Magistrate Judge recommended that Petitioner has not shown sufficient cause for the default and actual prejudice as a result of the alleged violation or that failure to consider the claims will result in a fundamental miscarriage of justice. *Id.* at 23–24.

Petitioner's entire objection consists of one paragraph, stating:

With respect to Ground Three, the Magistrate Judge found Petitioner's claim was barred because, even though she made an argument regarding the coerced verdict

in her direct appeal, "the undersigned cannot find that any federal claim was fairly presented to the South Carolina Supreme Court." Petitioner submits that the claim was fairly presented to the South Carolina Supreme Court, but they declined to address it. This Court can therefore address the claim *de novo* and grant Petitioner relief.

ECF No. 19 at 1.[16]

Respondent argues "this claim is procedurally defaulted under *Coleman* because appellate counsel did not present the same argument [that Petitioner was substantially and injuriously prejudiced by the trial judge's *Allen* charge] to the South Carolina Supreme Court on direct appeal, even though trial counsel objected to the jury instruction and it was preserved for appellate review." ECF No. 20 at 5.

The Court finds that whether Petitioner fairly presented a federal claim to the South Carolina Supreme Court is not clear; however, even if Petitioner's claim is not procedurally barred, it fails on the merits.

### 1. Procedural Bar

In her final brief to the state court, Petitioner raised the argument that the "forced deliberations violated S.C. Code § 14-7-1330 [a state statute, which provides the procedure to follow when a jury fails to agree], and the forced deliberations resulted in a coerced verdict." ECF No. 8-24 at 63. With regard to the coerced verdict, Petitioner stated:

> Further, defense counsel correctly argued that the judge had coerced a verdict. He knew that three jurors were holding out and, obviously, they were in the minority. Yet, he gave an <u>Allen</u> charge over defense objection, even though the jury had not requested further instructions.

> The jury had twice indicated that it was deadlocked. It began deliberations at 1:37 p.m. on the first day and was sent home after informing the judge a second time that it was deadlocked nine-to-three at around 8:40 p.m. An <u>Allen</u> charge was

---

[16] Petitioner did not object to the Magistrate Judge's recommendation that Petitioner has not shown sufficient cause and prejudice or that a fundamental miscarriage of justice would occur if the claim is not considered. Thus, the Court will only address whether Petitioner's federal claim was presented to the South Carolina Supreme Court, such that it should not be procedurally barred.

given at 8:48 p.m. that night. At 9:14 a.m. the following morning, the judge gave a full <u>Allen</u> charge. Defense counsel then strongly alleged irregularities in the jury process when a note regarding neglect and the definition of a reasonable doubt was almost immediately given to the trial judge after the <u>Allen</u> charge. The jury returned with a verdict at 3:00 p.m. that afternoon.

In short, the jury deliberated seven hours the first day, twice telling the judge it could not reach a verdict, the second time in unequivocal terms. The jury deliberated almost seven hours the second day, with the judge continuing deliberations over defense counsel's motion for a mistrial and allegations of jury irregularities.

Considering all of the circumstances involved in this case, particularly since the state left the final deliberations to the judge's discretion and did not even argue for continued deliberations, the guilty verdicts in this case were coerced. *See Tucker v. Catoe*, 346 S.C. 483, 552 S.E.2d 712, 716 (2001).

ECF No. 8-24 at 69–70. As the Magistrate Judge correctly noted, the entire argument composed approximately one page in Petitioner's final brief. In addition, "Petitioner did not provide any legal standard with which to compare the facts of her case, nor did she provide any application for the appellate court. She cited a single South Carolina case to support her argument that the *Allen* charge was improper or that the guilty verdicts were coerced." ECF No. 15 at 22. Furthermore, the "purpose of § 14-7-1330 is 'to prevent forced verdicts, and to prevent undue severity of jury service.'" *Buff v. S.C. Dep't of Transp.*, 537 S.E.2d 279, 281 (S.C. 2000) (quoting *State v. Freely*, 89 S.E. 643, 644 (S.C. 1916)); *see State v. Anderson*, No. 2015-UP-568, 2015 WL 9393945, at *1 (S.C. Ct. App. Dec. 23, 2015) (same). Moreover, Petitioner did not contest the content of the *Allen* charge. Finally, within Petitioner's statement of the facts in her final brief, she stated, "[d]efense counsel continued to argue that the judge improperly forced the jury to continue deliberating in violation of the statute." ECF No. 8-24 at 26.

Thus, it is unclear whether Petitioner was actually raising an argument with regard to the coerciveness of the *Allen* charge or furthering her argument as to the trial judge's violation of the statute by forcing deliberations to continue—resulting in a coerced verdict.

Even Petitioner appears to be uncertain as to whether the South Carolina Supreme Court considered a federal claim. In her petition, she claimed that "[t]he South Carolina Supreme Court erred when it held, in summary fashion, that this issue was 'without merit' and disposed of it" by stating "Issue 8: *State v. Pauling*, 322 S.C. 95, 470 S.E.2d 106 (1996) (if jury asks for further explanation of the law after indicating deadlock, the requirements of 14-7-1330 are met)." ECF No. 1 at 56. Petitioner claimed this decision was "contrary to, or an unreasonable application of clearly established Federal law as determined by the United States Supreme Court regarding coercive *Allen* charges" and "also based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings" as required by section 2254(d) because "Petitioner was substantially and injuriously prejudiced by the judge's Allen charge," "the charge was coercive, and petitioner was denied her right to due process." ECF No. 1 at 56–57.

Then, Respondent moved for summary judgment on this ground, claiming it was procedurally defaulted as Petitioner's appellate counsel did not present the same argument to the South Carolina Supreme Court on direct appeal. ECF No. 8 at 57. Specifically, Respondent argued that "[n]either the issue as stated nor the briefs appellate counsel submitted on Petitioner's behalf . . . presented the argument that the *Allen* charge was unduly coercive. Rather, appellate counsel argued the violation of § 14-7-1330, which is purely a state law issue." ECF No. 8 at 62.

In her response, Petitioner switched positions and argued that the "issue was validly raised,[17] but the South Carolina Supreme Court did not address the issue." ECF No. 13 at 5. Thus, Petitioner now argues that the issue should be reviewed de novo in accordance with *Johnson v. Williams*, 133 S. Ct. 1088 (2013). *Id.* at 6.

---

[17] Petitioner takes this position due to her issue statement, which states "the judge's action violated § 14-7-1330 *and the forced deliberations resulted in a coerced verdict*." ECF No. 8-24 at 2 (emphasis added).

In *Williams*, the United States Supreme Court explained, "The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) restricts the circumstances under which a federal habeas court may grant relief to a state prisoner whose claim has already been 'adjudicated on the merits in State court.'" 133 S. Ct. at 1091 (quoting 28 U.S.C. § 2254(d)). However, it clarified "[w]hen a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits—but that presumption can in some limited circumstances be rebutted." *Id.* at 1096.

Petitioner only points to her issue statement to support that her federal claim was fairly presented to the South Carolina Supreme Court. ECF No. 13 at 5. In addition, Petitioner argues that the South Carolina Supreme Court "simply decided to remain silent on the federal issue, and determine the claim under state law." *Id.* at 6. Petitioner does not acknowledge that "if the state-law rule subsumes the federal standard—that is, if it is at least as protective as the federal standard—then the federal claim may be regarded as having been adjudicated on the merits." *Williams*, 133 S. Ct. at 1096. Nor does she attempt to distinguish this case from *Williams* wherein the United States Supreme Court stated, "Regardless of whether a California court would consider Williams' § 1089 and Sixth Amendment claims to be perfectly coextensive, the fact that these claims are so similar makes it unlikely that the California Court of Appeal decided one while overlooking the other." *Id.* at 1098–99 (regarding trial judge's dismissal of a juror). Here, as stated above, the purpose of the state statute (§ 14-7-1330) is to prevent forced verdicts and Petitioner only argues that her issue statement raised a federal claim by stating "the forced deliberations resulted in a coerced verdict."

This Court finds that Petitioner did not fairly or properly present her federal claim to the state court. Furthermore, Petitioner inconsistently requests this Court to apply different

standards—at first arguing that the federal claim was addressed by the state court and should be evaluated under section 2254(d) then arguing that the state court failed to address the federal claim so it should be reviewed de novo. Finally, if a federal claim was fairly presented, Petitioner has not successfully overcome the rebuttable presumption that the South Carolina Supreme Court did not adjudicate it on the merits.

However, even if Petitioner's claim was not procedurally barred and she successfully argued that the adjudication on the merits presumption was rebutted so the claim should be reviewed de novo, it fails upon the merits.

### 2. De Novo Review of *Allen* Charge[18]

"There is no doubt that '[a]ny criminal defendant . . . being tried by a jury is entitled to the uncoerced verdict of that body.'" *Booth-El*, 288 F.3d at 580 (quoting *Lowenfield v. Phelps*, 484 U.S. 231, 241 (1988)). Yet, the United States Supreme Court has specifically approved the use of supplemental jury instructions—the *Allen* charge. *Id.* "An *Allen* charge, based on the Supreme Court's decision in *Allen v. United States*, 164 U.S. 492 (1896), is an instruction advising deadlocked jurors to have deference to each other's views, that they should listen, with a disposition to be convinced, to each other's argument." *Lee*, 781 F.3d at 120 n.4 (internal quotations omitted). The decision to give an *Allen* charge is within the discretion of the trial

---

[18] As discussed above, it was unclear whether Petitioner even raised a federal claim in her final brief. For example, Petitioner does not argue the charge's content was coercive—only forcing the jury to continue deliberations resulted in a coerced verdict. At the conclusion of her final brief's argument, Petitioner cited a single state case that discusses "reasonable deliberation" as required under a death penalty statute verses § 14-7-1330—the statute at issue in her state claim—and a "petitioner's allegation that the *Allen* charge was unconstitutionally coercive on the merits." *Tucker v. Catoe*, 552 S.E.2d 712, 716 (S.C. 2001). However, for the following discussion, the Court is assuming *arguendo* that Petitioner raised a federal claim in her final brief and the South Carolina Supreme Court did not adjudicate it on the merits. *See Baldwin v. Reese*, 541 U.S. 27, 32 (2004) (stating "[a] litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state-court petition or brief . . . by citing in conjunction with the claim . . . a case deciding such a claim on federal grounds . . . ."). Therefore, out of an abundance of caution, this Court will proceed to evaluate the claim of a coerced verdict due to the *Allen* charge de novo.

court. *Id.* The South Carolina Supreme Court has adopted four factors from the United States Supreme Court's decision in *Lowenfield* to determine whether an *Allen* charge is unconstitutionally coercive:

> (1) Does the charge speak specifically to the minority juror(s)?
> (2) Does the charge include any language such as "You have got to reach a decision in this case"?
> (3) Is there an inquiry into the jury's numerical division, which is generally coercive?
> (4) Does the time between when the charge was given, and when the jury returned a verdict, demonstrate coercion?

*Workman v. State*, 771 S.E.2d 636, 638 (S.C. 2015); *see Lowenfield*, 484 U.S. 231. The Fourth Circuit has considered the following factors relevant in reviewing an *Allen* charge for coerciveness:

> the charge in its entirety and in context; suggestions or threats that the jury would be kept until unanimity is reached; suggestions or commands that the jury must agree; indications that the trial court knew the numerical division of the jury; indications that the charge was directed at the minority; the length of deliberations following the charge; the total length of deliberations; whether the jury requested additional instruction; and other indications of coercion.

*Tucker v. Catoe*, 221 F.3d 600, 611 (4th Cir. 2000).

In this case, after a three week-long trial, the jury began deliberations at 1:37 p.m. on Day One. ECF No. 8-22 at 50. At approximately 5:00 p.m., the jury sent the following note to the trial judge: "The Jury is hung. We cannot get All 12 people to Agree. 3 Juror's have reasonable Doubt and cannot be convinced otherwise. What do we do?" ECF Nos. 8-22 at 63; 8-28 at 72 ("Exhibit 18"). The trial judge responded, "You have heard almost 3 weeks of testimony and have been deliberating about 3 ½ hours. Please keep trying." *Id.*

At 5:47 p.m., the trial judge called the jury to the courtroom on his own accord and "asked them if maybe they could benefit by going home and getting a good night's rest and coming back [in the] morning." ECF No. 8-22 at 50–52, 63–64. At that time, the jury stated they

19

preferred to stay and accepted the trial judge's offer to order dinner for them. *Id.* The jury returned to their jury room at 5:50 p.m. *Id.*

At approximately 6:00 p.m., the jury sent another note requesting a calendar of events and the transcript of previous testimony. ECF Nos. 8-22 at 64; 8-28 at 73 ("Exhibit 19"). The trial judge responded that the calendar of events was not marked as an exhibit so it could not be sent into the jury room, but the jury could listen to the recorded testimony in the courtroom. *Id.* However, before the trial judge could send his response, the jury sent another note requesting additional transcripts. ECF Nos. 8-22 at 64; 8-28 at 70 ("Exhibit 16").[19] The trial judge responded to that note as well and stated that the court did not have the ability to print the transcripts so quickly; however, the jury could listen to the testimony in the courtroom. ECF No. 8-22 at 64. At 6:15 p.m., the jury returned to the courtroom to listen to the testimony. ECF No. 8-22 at 55. At 7:05 p.m., the jury retired to the jury room. *Id.* at 56.

At approximately 8:40 p.m., the jury sent the final note of the day, which stated: "We continue to disagree on All 3 Counts. There Are 3 Jurors who absolutely will not change their minds or Discuss the issues further. They have said there is no evidence that they can review again that would change their opinion. One will not even discuss it further. Question – The 3 Jurors want to know if its Appropriate for them to go along with the majority?" ECF No. 8-28 at 71 ("Exhibit 17"). At 8:48 p.m., the jury returned to the courtroom. ECF No. 8-22 at 60. The trial judge addressed the jury as follows:

> All right. Madam Forelady, I have received your note. I understand your situation as you have expressed it to me in your note and your earlier communications.
>
> I have some additional instructions that I can give you specifically on the question of how you should make further attempts to reach a verdict.

---

[19] As explained by the trial judge, the notes received from the jury were marked as exhibits in a different order than they were received. *See* ECF No. 8-22 at 63.

In final analysis what it amounts to is that it is your duty, your responsibility to reach a verdict if you can do so without any juror doing violence to his or her own conscience.

And so I'm going to send you home and I'm going to ask you to be back at 9:00 o'clock in the morning, and I'm going to give you the additional instructions that I have available in an effort to assist you in trying to reach a verdict, trying to resolve this case.

Nobody wins if you can't reach a verdict. It just means we have to do all this again. And there's no 12 people in Richland County any better able to decide this case than the 12 of you.

So I'm going to ask you to go home at this time. Please do not talk about this case. I know there's been some things on the television about it today, it may be on the news in the morning -- I mean, at night, at 11:00 o'clock, 10 o'clock, and in the morning.

Please don't expose yourself to any of that news. *Please be back in the morning at 9:00 o'clock, where I will give you some additional instructions, and ask you to see if you can reach a verdict in the case.*

Thank you very much. You are excused. . . .

*Id.* at 60–61 (emphasis added).[20] At 8:50 p.m., the jury exited the courtroom to go home. *Id.* at 61. Defense counsel objected to the jury returning the following day on two grounds: (1) there were already two returns by the jurors indicating they were deadlocked, and (2) the question of whether the minority should go along with the majority should simply be answered, "No." *Id.* at 61–62. At 9:14 a.m., the jury returned to the courtroom, and the trial judge proceeded to give the following *Allen* charge:

---

[20] To the extent that Petitioner contends the statements made by the trial judge before dismissing the jury for the evening constituted an *Allen* charge, it is irrelevant. The trial judge specifically stated that he was going to give the charge in the morning and tried to give a precursor of the *Allen* charge's purpose before dismissing the jury for the evening. There has been no argument made that the alleged initial *Allen* charge was coercive and the entire colloquy of bringing the jury into the courtroom and dismissing them for the evening lasted about two minutes. Furthermore, a second *Allen* charge is not per se coercive. *United States v. Cornell*, 780 F.3d 616, 626 (4th Cir.), *cert. denied*, 136 S. Ct. 127 (2015) (declining to adopt a flat ban on multiple *Allen* charges).

All right. Now, the last note that you sent out yesterday, Madan Forelady, had a question at the bottom. And it said basically, the jurors in the minority wanted to know if it was appropriate for them to go along with the majority.

Well, no, it's not appropriate for the jurors to go along with the majority. The verdict has to be the unanimous verdict of the entire jury; and that's the purpose of my additional instructions to you this morning, to kind of explain that a little bit.

I've already told you that the verdict has to be unanimous, and so you understand that.

I've already told you that you are to consider three cases, and that your decision on each must be made as to the evidence that applies to that case independently of the other cases. Although some of the evidence might apply to all three cases, you have to consider each case individually and reach your decision on each case individually.

And I've already told you that if you have a reasonable doubt, you've got to give the benefit of that reasonable doubt to the defendant and find her not guilty.

Now, so you know those basic premises that guide your deliberation back there. So I'm going to give you some additional instructions, and they are relatively brief compared to everything that you've gotten thus far, but it concerns the matter of you being able to reach a verdict.

As I've told you, you are the sole judges of the facts and the evidence in the case; that's not my position. I'm not, as I've said, even permitted to hint to you what I think about this case or what your verdict ought to be in this case. It's my duty to charge you on the law in this case, and I've done that. And then it's your duty to bring in the verdict.

Now, when a matter is in dispute, it's very difficult sometimes to get two people - - two men or two women or a lady and a man, even two people to agree on a matter. And when 12 people have to agree on a matter, it becomes increasingly difficult to agree. But it is important that litigation -- and this is litigation -- be ended if it can be ended without a single one of you doing violence to your own conscience.

No juror is expected to give up opinion based on satisfactory reason merely for the purpose of being in agreement, as I said.

You are not called upon very often to try cases. But as one of the judges in this state who tries cases virtually every week of the year, I can tell you that it is very rare that we have a jury go in the jury room and just turn right around and come back out and say, we have a verdict. And that's what would happen if everybody

saw everything the same way. There would be no questions and we would get a verdict immediately. And I can tell you, that's very rare.

But by the same token, we do usually get a verdict. It's rare when a jury cannot agree, after giving careful thought and careful consideration and deliberation to all of the evidence, in putting aside all extraneous matter and other things that might influence you, putting aside all of that, jurors usually come to an understanding and are able to reach a unanimous verdict.

It has never been intended that the verdict of a jury should be the verdict of one person.

On the other hand, a verdict of the jury is the collective reasoning of all persons put together; that's why we have a jury, that's why we have a jury of our peers, a wide cross section of our -- in this circumstances, our county, people from all area of the county, all walks of life, all educations, all backgrounds, and professions, and that type of thing. So we get the wisdom that come from that collective reasoning.

It becomes your duty to tell the other jurors how you feel about the case and why you think as you do. And I'm sure you've been doing that.

On the other hand, it becomes each of your duty as a juror to listen and to exchange views and listen to each other and give to the other's thought such meaning and consideration as you think it should have. And so to a degree it can be said that jury service is a matter of give and take.

Now, each of you must decide the case for himself or herself in the final analysis. But you should do so only after an impartial consideration of the evidence in the case with your fellow jurors.

In the course of your deliberations, do not hesitate to re-examine you own views and change your opinion if you become convinced it is erroneous.

Now, I know that's not easy to back away from an opinion that you've expressed previously.

But whether you are in the majority or whether you are in the minority, don't hesitate to reconsider your position in light of the fact that other jurors who are just as conscientious and just as impartial as you are and who are bound by the same oath as you are have come to a different conclusion.

Every juror should reflect upon the correctness of his preliminary appraisal of the evidence. Even if you have a firm conviction about the case one way or the other, that doesn't mean that you shouldn't listen to reason and think with the others and listen, with a disposition to being convinced of what the other jurors are saying.

23

Each juror who finds himself or herself to be in the minority should reconsider that view in light of the opinions of the jurors of the majority.

And conversely, each juror finding himself to be in the majority, should give equal consideration to the views of the minority.

I would ask you that you continue to deliberate with each other, discuss the case, listen and talk with each other, and don't just turn your back and say, well, this is all I'm going to do. Be willing -- have an open mind.

It is important that litigation be ended. And it should be ended in the form of a verdict by no juror doing violence to his own conscience. No juror, as I said, is expected to give up an opinion that's satisfactory to himself merely for the purpose of being in agreement.

But remember also that after full deliberation and consideration of the evidence in this case, it is your duty to agree upon a verdict in this case if you can do so without disobeying your individual judgment and conscience.

Now, I don't know how you've been deliberating. And you can deliberate in any manner that you choose. But I would suggest that you may want -- do you have a chalkboard back there or a flip chart like this one?

Forelady: We have a chalkboard.

The Court: That you might want to write down the areas of disagreement. And you might find out by doing that, that maybe the areas are not -- maybe they're a little narrower. Maybe you can narrow the areas of disagreement and find out that the disagreement is not as great as it would seem.

Some times when you write things down, it helps to get them in the right perspective. And if you get the areas of disagreement down, you get them kind of narrowed down, then you can talk about it among yourselves. And listen to both sides, both positions. Give due respect to everybody's position and see if you can reach a unanimous verdict in this case.

As I've already told you and as you already know, we can play back any testimony that you want to hear or any portion of that testimony. If there's a portion of a witness' testimony and you can kind of describe it to us, we'll do our best to pick it out and find it for you.

If you need any more instructions on the law, that's very easy. I can do that because I've got all that right here in writing and I don't have to worry about the tape machine. But the court reporter, given a little time, can find anything you want to hear.

> If there are any other questions or any way that this court can assist you in trying to reach your unanimous verdict in this case, I'll be happy to do so.
>
> Thank you very much. I'll ask you if you would return to the jury room and continue your deliberations at this time.

*Id.* at 68–74. The jury retired to the jury room at 9:23 a.m. *Id.* at 74. After the *Allen* charge was given, the trial judge inquired if the defense counsel had any objections, to which he responded:

> Yes, Your Honor. Of course, I apologize. I should have brought this up prior to bringing the jury out. I would ask that they be brought out again and informed clearly that if they are unable to arrive at a verdict after due deliberation at this point in time, they will be discharged.
>
> They have no idea of how long they can be continued to be -- with all due respect -- forced to continue their deliberations and I submit that it's only fair to let them know that there is an end to this process.

*Id.* at 74–75. The trial judge replied, "All right, sir. I think they understanding [sic] that, and so I would not bring them back out." *Id.* at 75. Defense counsel stated, "Thank you, Sir. That's all I have." *Id.* After the *Allen* charge, the jury sent two notes requesting, among other questions raised, definitions for reasonable doubt and homicide by child abuse. *Id.* at 75–88. The jury returned to the courtroom at 10:02 a.m. to receive answers to its questions and retired to the jury room at 10:07 a.m. *Id.* at 82–84. At 12:40 p.m., the jury returned to the courtroom to address their request for an expanded definition of assault and battery of a high and aggravated nature. *Id.* at 85. The jury retired to the jury room at 12:44 p.m. and defense counsel stated his continuing objection, "being here today, given the basis for our objections at 8:30 p.m. last night." *Id.* at 88.[21] The trial judge responded, "All right, Sir. I understand. Thank you very much. We'll be in recess." *Id.* At 3:00 p.m., the jury returned to the courtroom upon reaching its verdicts on all three counts—finding Petitioner guilty on both counts of homicide by child abuse as to Child 1 and Child 3, but not guilty as to Child 3 and any remaining charges. *Id.* at 89–91.

---

[21] Notably, the objection was raised before the *Allen* charge was provided.

In the Fourth Circuit, while "determining whether an *Allen* charge has an impermissibly coercive effect on jury deliberations, some of the factors we consider include the language of the instruction, its incorporation with other instructions, the timing of the instruction, and the length of the jury's subsequent deliberations." *United States v. Cornell*, 780 F.3d 616, 626 (4th Cir.), *cert. denied*, 136 S. Ct. 127 (2015). "These factors are not exclusive, and in the end, the ultimate question is whether the *Allen* instruction was impermissibly coercive." *Id.* at 626–27. *Tucker v. Catoe*, 221 F.3d 600, 611 (4th Cir. 2000) (reciting relevant considerations for coerciveness of *Allen* charges).

For ease of reference, this Court will evaluate whether the *Allen* charge resulted in a coerced verdict by focusing on four primary factors that encompass others. *See Tucker v. Catoe*, 552 S.E.2d 712, 716 (S.C. 2001); *Tucker v. Catoe*, 221 F.3d 600, 609–13 (4th Cir. 2000)[22]; *Lownfield v. Phelps*, 484 U.S. 231 (1988).

### a. Does the charge speak specifically to the minority juror(s)?

As to the first factor, the *Allen* charge did specifically speak to the minority jurors; however, it also spoke to the majority jurors. Specifically, the trial judge made the following statements: (1) "But whether you are in the majority or whether you are in the minority, don't hesitate to reconsider your position"; (2) "Every juror should reflect upon the correctness of his preliminary appraisal of the evidence"; (3) Each juror who finds himself or herself to be in the minority should reconsider that view in light of the opinions of the jurors of the majority . . . And conversely, each juror finding himself to be in the majority, should give equal consideration to the views of the minority"; (4) "No juror . . . is expected to give up an opinion that's satisfactory

---

[22] The Fourth Circuit evaluated whether an *Allen* charge was coercive upon review of a federal habeas corpus claim regarding ineffective assistance of counsel and concluded the charge was coercive. *See Tucker v. Catoe*, 221 F.3d 600, 609–13 (4th Cir. 2000). Due to the overlapping discussions and agreeing conclusions of the cases in the Fourth Circuit and South Carolina Supreme Court regarding *Tucker*, the more recent factors as articulated by the South Carolina Supreme Court's opinion have been used.

to himself merely for the purpose of being in agreement"; and (5) "listen to both sides, both positions. Give due respect to everybody's position and see if you can reach a unanimous verdict in this case." Id. at 72–74.

Although some of the language from the trial judge's *Allen* charge was similar to *Tucker*, 552 S.E.2d at 717, this case is distinguishable because, here, the trial judge specifically stated that the majority should consider the minority's opinion and "[n]o juror . . . is expected to give up an opinion that's satisfactory to himself merely for the purpose of being in agreement." Thus, the language used by the trial judge in addressing the minority was not coercive. *See State v. Williams*, 690 S.E.2d 62, 68 (S.C. 2010) (distinguishing the case from *Tucker* because the *Allen* charge "evenly addressed both the majority and minority jurors and urged them to consider each other's views"); *see also Tucker*, 221 F.3d at 610 (citing *United States v. Burgos*, 55 F.3d 933, 937 (4th Cir.1995) (stating "we have strongly endorsed the giving of *Allen* charges wherein the majority of jurors are instructed to consider the views of the jurors in the minority").

**b.  Does the charge include any language such as "You have got to reach a decision in this case"?**

With regard to the second factor, the trial judge did not state "You have got to reach a decision in this case"; however, the trial judge did impress upon the jury "it's your duty to bring in the verdict," and "it is important that litigation . . . be ended if it can be ended without a single one of you doing violence to your own conscience." ECF No. 8-22 at 69–70. In addition, the trial judge also stated, "No juror is expected to give up [his or her] opinion based on satisfactory reason merely for the purpose of being in agreement." *Id.* at 70. The trial judge appropriately stated, "after full deliberation and consideration of the evidence in this case, it is your duty to agree upon a verdict in this case if you can do so without disobeying your individual judgment and conscience." *Id.* at 73. Most importantly, the trial judge concluded, "Give due respect to

27

everybody's position *and see if you can reach a unanimous verdict in this case*." *Id.* at 74 (emphasis added).[23]

Therefore, the trial judge did not tell the jury that it would be forced to render a verdict and only reiterated the duty to attempt to reach a verdict in good conscience. *See Williams*, 690 S.E.2d at 68 (stating the *Allen* charge was not coercive as in *Tucker* because "the charge instructed the jurors to resume their deliberations 'with the hope you can arrive at a verdict'"); *see also Tucker*, 221 F.3d at 609 n.5 (quoting *Jenkins v. United States*, 380 U.S. 445, 446 (1965) (per curiam) (explaining the United States Supreme Court reversed a conviction due to a coercive *Allen* charge when the trial judge stated, "You have got to reach a decision in this case" because "jurors may not be coerced into surrendering views conscientiously held is so clear as to require no elaboration").

### c. Is there an inquiry into the jury's numerical division, which is generally coercive?

With regard to the third factor, there was not an inquiry into the jury's numerical division. However, the jury did inform the judge that three jurors were not in agreement and had "reasonable doubt" on its own accord via a note to the trial judge. Unlike in *Tucker*, this trial judge disclosed the note to the attorneys and entered it as an exhibit. *See* ECF No. 8-28 at 72. Unfortunately, the trial judge failed to remind the jury not to release this information as evidenced by his response and the fact that the jury again revealed their numerical split—but not alignment—in another note written later that day. *See id.* at 71. However, the trial judge's careful charge stated that the minority and majority should consider each other's opinions. This important factor distinguishes the actions of the trial judge in this case from *Tucker* wherein the

---

[23] Even the conclusion of the trial judge's alleged initial *Allen* charge stated, "Please be back in the morning at 9:00 o'clock, where I will give you some additional instructions, and *ask you to see if you can reach a verdict* in the case." *Id.* at 61 (emphasis added).

trial judge did not inform the parties that the jury's numerical division and alignment had been disclosed to him and the "charge singled out the minority juror." *Tucker*, 221 F.3d at 611; *see Tucker*, 552 S.E.2d at 717–18 (stating "knowledge of the jury's numerical division combined with knowledge of its decisional disagreement, followed by an *Allen* charge directed, at least in part, to minority jurors" was "impermissibly coercive").

Thus, it does not appear that the trial judge in this case made any attempt to use this numerical division for one's side favor as he specifically directed the majority and minority to consider one another's views equally. *See Williams*, 690 S.E.2d at 68 (distinguishing case from *Tucker* because there was no inquiry into the jury; however, "without solicitation the jury disclosed its numerical division to the trial judge who then informed the trial attorneys" and "did not direct his *Allen* charge to the three minority jurors despite his knowledge of the jury's numerical split"); *see also United States v. Sawyers*, 423 F.2d 1335, 1341 (4th Cir. 1970) (stating "the trial judge may not inquire as to how the jury stands, and thus may not knowingly press for a verdict either way except in the rare instance when the jurors disclose to him, without inquiry, their division"); *United States v. Meraz-Fugon*, No. 16-4506, 2017 WL 544591, at *2 (4th Cir. Feb. 10, 2017) (stating "[n]or did the district court judge's knowledge of the jury's numerical division render the charge coercive in this instance, particularly in light of the fact that the jury's note indicating they were divided did not identify whether the majority favored conviction or acquittal" and further deliberation had occurred between receipt of the notes).

### d. Does the time between when the charge was given, and when the jury returned a verdict, demonstrate coercion?

With regard to the fourth factor, the *Allen* charge was given at 9:14 a.m. and lasted less than ten minutes. The jury retired to its room to deliberate at 9:23 a.m. The jury did not render its verdicts until approximately 3:00 p.m.—almost six hours later, which is almost half of the total

thirteen hours spent in deliberations. During the course of that time, the jury sent two notes and requested at least three legal definitions relevant to the charges from the trial judge. Thus, this case is distinguishable from *Tucker* wherein the verdict was reached approximately an hour and a half after the *Allen* charge and there is no indication that additional information was sought. *Tucker*, 221 F.3d at 612; *Tucker*, 552 S.E.2d at 713–18.

Due to the length of time that passed after the *Allen* charge and the additional information sought by the jury during that time, a coerced verdict is not demonstrated. *See Williams*, 690 S.E.2d at 68 (recognizing "the jury deliberated for approximately three hours and forty-five minutes after being given the *Allen* charge, which was significantly longer than the *Tucker* jury" and "the extended deliberations would appear to weigh against any allegation that the charge was coercive"); *see also Cornell*, 780 F.3d at 627 ("In sum, we are unpersuaded that the jury was coerced into reaching its verdict. After the second *Allen* charge, the jury deliberated for several more hours and returned a split verdict, indicating they carefully considered the evidence against each defendant. *Compare Booth–El v. Nuth,* 288 F.3d 571, 580–82 (4th Cir. 2002), *with Tucker v. Catoe*, 221 F.3d 600, 611 (4th Cir. 2000)."); *United States v. Cropp*, 127 F.3d 354, 360 (4th Cir. 1997) ("Finally, the jury's own behavior reassures us that they were not coerced by the instruction or anything else. Following the second charge, the jury deliberated for an additional seven hours before reaching verdicts. Although the length of deliberations following an *Allen* charge is not certain evidence that the jury was not coerced by that charge, lengthy deliberations can reassure a reviewing court that coercion did not occur.").

Generally, "*Allen* charges will be upheld as long as they are 'fair, neutral, and balanced.'" *Tucker*, 221 F.3d at 610 (quoting *Carter v. Burch*, 34 F.3d 257, 264 (4th Cir. 1994)). "[I]n reviewing the propriety of an *Allen* charge, the issue is not what the jurors might have been

thinking. Rather, it is whether the instruction given by the trial court 'in its context and under all the circumstances' was coercive." *Booth-El*, 288 F.3d at 581 (quoting *Lowenfield*, 484 U.S. at 237). As discussed above, in this case, the verdicts were not coerced.

Thus, even if Petitioner's claim was not procedurally barred because it was fairly presented to the state court, it fails on the merits under de novo review and, consequently, the more deferential standard under section 2254.[24] Therefore, Petitioner's objection is overruled, and Respondent's motion for summary judgment is granted as to this claim.

### D. Ground Four

Petitioner's fourth ground is "[t]he evidence adduced at trial was insufficient to support the convictions for homicide by child abuse." ECF No. 1 at 57. Regarding Ground Four, the Magistrate Judge recommended that Respondent's motion for summary judgment should be granted upon this ground as there was sufficient information for a "rational trier of fact" to find "proof beyond a reasonable doubt." ECF No. 15 at 33–34.

Petitioner's entire objection consists of one paragraph, stating:

> With respect to Ground Four, the Magistrate Judge found that the State provided sufficient evidence at trial to support the South Carolina Supreme Court's summary dismissal of the claim on direct appeal. Petitioner objects to this finding and submits that the evidence, in fact, was not sufficient to prove her guilty.

ECF No. 19 at 1–2.

---

[24] *See Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal citations and quotations omitted) ("[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must be objectively unreasonable. This distinction creates a substantially higher threshold for obtaining relief than de novo review. AEDPA thus imposes a highly deferential standard for evaluating state-court rulings, and demands that state-court decisions be given the benefit of the doubt."); *see also Tucker*, 221 F.3d at 612–13 (finding, although the *Allen* charge was coercive, the petitioner's claim failed to meet the standard required under AEDPA to show the state court's adjudication was unreasonable).

Respondent argues that Petitioner is not entitled to relief "because there was substantial circumstantial evidence which reasonably tended to prove that she was guilty of both crimes." ECF No. 20 at 6. In addition, Respondent provided approximately thirty pages recounting the evidence provided at trial against Petitioner. *Id.* (citing ECF No. 8 at 63–95). Respondent also points to Petitioner's failure to exhibit how the South Carolina Supreme Court's decision was contrary to or an unreasonable application of federal law as well as an unreasonable determination of the facts in light of the evidence presented. *Id.*

Petitioner does state that her "case is wholly dissimilar from other cases in which the Fourth Circuit has found evidence sufficient to support convictions." ECF No. 1 at 58; ECF No. 13 at 10. However, as the Magistrate Judge noted and Petitioner failed to address in her terse objection, Petitioner does not explain how the cases are dissimilar other than perhaps stating—in parenthetical explanations—the other cases had witnesses to the criminal acts. However, "[t]he Supreme Court has long recognized that circumstantial evidence can provide the basis for criminal convictions." *United States v. Abu Ali*, 528 F.3d 210, 236 (4th Cir. 2008) (citing *Holland v. United States*, 348 U.S. 121, 137–38 (1954)); *see United States v. Russell*, 971 F.2d 1098, 1108, 1111 (4th Cir. 1992), *as amended* (Aug. 12, 1992) (affirming murder conviction because "[a]lthough the evidence of [the defendant's] guilt was entirely circumstantial, it was substantial" despite the fact "neither the victim's body nor a weapon was recovered, and there were no witnesses to the crime"). Thus, the mere fact that there were no eyewitnesses of the abuse or deaths in this case does not preclude Petitioner from being found guilty on the charges of homicide by child abuse.

In her final brief to the state court, Petitioner argued that the trial judge had "erred by refusing to direct a verdict acquitting appellant of both counts of homicide by child abuse." ECF

No. 8-24 at 52. Within her argument, Petitioner contended that the State failed to present evidence to exclude Petitioner's husband as the perpetrator. *Id.* at 54. In addition, Petitioner argued that the State's theory—Petitioner was abusing the children—ignored testimony of the State's expert, Dr. John Emery, who testified[25] that he believed some of the trauma sustained by the children had occurred "days, perhaps weeks" before their deaths and "not just . . . something which occurred minutes or perhaps an hour . . . before the death of the child." *Id.*

First, Petitioner fails to acknowledge that evidence was presented showing Petitioner was the last person with Child 1 before he was found not breathing. The mother of Child 1 testified that Petitioner had told her "Child 1 was taking a nap. [Petitioner] went in and checked on him. He was asleep. She went in the kitchen, reached up in the cabinet to get his food down. [Then, Petitioner's husband] came in behind her and screamed, Child 1 [is] not breathing, call 9-1-1." ECF No. 8-13 at 50–51. Child 1's mother testified that Petitioner never told her how long Petitioner spent with the child, but Petitioner did explain that "she checked on Child 1, walked in the kitchen [right beside the living room], and reached in the cabinet," which perhaps took "a few seconds." *Id.* at 51. In addition, with regard to Child 3, evidence showed Petitioner was the only adult home at the time of the death and informed the parents that "Child 3 and another little baby were sitting cooing and gnawing at each other and playing, and it looked like they were carrying on baby talk. And then Child 3 got fussy and she put her down for a nap." ECF No. 8-13 at 109. Moreover, Child 3's mother testified that Petitioner had informed her "[w]hen she found Child 3 not breathing . . . [s]he didn't do anything"—Petitioner did not perform CPR, call 9-1-1, or contact Child 3's mother. *Id.* at 133.

---

[25] Dr. Emery's testimony was presented via taped testimony from one of Petitioner's previous trials because he passed away prior to the third trial. ECF No. 8-11 at 103.

Second, the testimony of the State's expert, Dr. Emery—regarding his determination that some of the trauma sustained by the children had occurred "days, perhaps weeks" before their deaths and "not just . . . something which occurred minutes or perhaps an hour . . . before the death of the child"—was with regard to bleeding in the children's lungs. ECF No. 8-11 at 135. Dr. Emery testified that the children exhibited two symptoms—petechial hemorrhages/subdural hematoma in the brain and hemosiderin stains in the lungs. *Id.* at 137. The symptom in the brain was "likely associated with trauma," which could "be a blow or it could be a shaking." *Id.* Then, Dr. Emery stated, "Now when you come to the lungs on the hemosiderin, we've got evidence that something else had been affecting the lungs so there had been some trauma affecting the lungs." *Id.* at 138. Thus, Dr. Emery concluded, "So we've got evidence in these children, not just of something occurred minutes or perhaps an hour and seconds before the death of the child, you've got -- had separate evidence which had happened days, perhaps weeks, previously." *Id.* Moreover, it was one of Petitioner's experts—Dr. Smialek—who disagreed with Dr. Emery that there was evidence of previous abuse. Petitioner's counsel asked Dr. Smialek, "[I]s there any consensus in the medical community that the presence of hemosiderin in the lungs is indicative or diagnostic of a prior asphyxial episode?" ECF No. 8-14 at 123. Dr. Smialek responded, "No, that consensus absolutely does not exist." *Id.*

"The jury, not the reviewing court, assesses the credibility of the witnesses and resolves any conflicts in the evidence presented." *United States v. Lentz*, 383 F.3d 191, 199 (4th Cir. 2004). Thus, "if the evidence supports different, reasonable interpretations, the jury decides which interpretation to believe." *Id.* (quoting *United States v. Wilson*, 118 F.3d 228, 234 (4th Cir. 1997). "Indeed, 'federal habeas courts [have] no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them.'" *Cagle v. Branker*,

520 F.3d 320, 324 (4th Cir. 2008) (quoting *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983)). Therefore, it was for the jury to decide which witnesses to believe and which expert was correct while resolving any conflicting evidence presented—not the South Carolina Supreme Court or this Court.

"When addressing a sufficiency challenge, '[w]e must view the evidence in the light most favorable to the government and inquire whether any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt.'" *Lentz*, 383 F.3d at 199 (citing *Wilson*, 118 F.3d at 234). In this case, Petitioner was convicted of two counts of homicide by child abuse. Under South Carolina law, "A person is guilty of homicide by child abuse if the person . . . causes the death of a child under the age of eleven while committing child abuse or neglect, and the death occurs under circumstances manifesting an extreme indifference to human life." S.C. Code Ann. § 16-3-85; ECF No. 8-28 at 77, 80 ("Indictment for Homicide by Child Abuse" for Child 1 and Child 3).

The State provided evidence that Child 1 and Child 3—both less than a year old—died from traumatic, inflicted injuries while Petitioner was their designated caretaker and within seconds after or during Petitioner's contact or presence alone with the children. *See, e.g.*, ECF Nos. 8-7 at 76, 116–17; 8-8 at 26, 129–30; 8-11 at 147–50, 205, 214; 8-13 at 50–51, 132–33. The State presented evidence that Petitioner exhibited symptoms of MSBP—a condition that was presented as a medical diagnosis of child abuse and showed the abuser committed these acts for attention—that served as a motive. *See, e.g.*, ECF Nos. 8-2 at 1–2; 8-7 at 35–36, 44–50. Even when aligning with Petitioner's claim that she simply found Child 3 not breathing, she admits that she did not administer CPR (although she was certified to administer it to infants),

immediately call 9-1-1 for assistance, or notify the mother of the child. ECF Nos. 8-13 at 33–36, 133; 8-14 at 1.

As the Magistrate Judge noted, the correct standard to apply is not that of "overwhelming guilt" as Petitioner alludes, "[i]nstead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "[T]his inquiry does not require a court to ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." *Id.* at 318–19 (internal quotations omitted). Here, after reviewing the evidence adduced at this trial, a rational trier of fact could have found proof of guilt beyond a reasonable doubt that Petitioner committed homicide by child abuse as to Child 1 and Child 3. *See id.* at 324; ECF No. 8-2 at 140–70 (an almost three week trial presenting over 75 witnesses). Thus, the state court's decision that there was sufficient circumstantial evidence to support the inference and a finding beyond a reasonable doubt that Petitioner committed the acts of homicide by child abuse as to Child 1 and Child 3 was not objectively unreasonable under the standard enunciated in *Jackson*. *See Williams v. Ozmint*, 494 F.3d 478, 489–90 (4th Cir. 2007); *Cutro II*, 618 S.E.2d 890.

Petitioner has failed to show the state court's decision was contrary to, or involved an unreasonable application of, clearly established federal law or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding. 28 U.S.C. § 2254(d). Therefore, Ground Four is without merit and Respondent's motion for summary judgment is granted.[26]

---

[26] This Court did not consider the juror's affidavit regarding the internal deliberations of the jury as the United States Supreme Court has not adopted an exception for this circumstance. *See Pena-Rodriguez v. Colorado*, __ S. Ct. __, 2017 WL 855760 (March 6, 2017) (stating the United States Supreme Court had only addressed the precise question whether the Constitution mandates an exception to Rule 606(b) in two

IV.      **CONCLUSION**

After a careful review of the record, the applicable law, the Report and the objections thereto, this Court finds the Magistrate Judge's recommendation is proper. Accordingly, the Court **ADOPTS** the Report and Recommendation, as modified, of the Magistrate Judge and **INCORPORATES** it by reference. ECF No. 15.

It is therefore **ORDERED** that Respondent's motion for summary judgment (ECF Nos. 8, 9) is **GRANTED** and Petitioner's petition for writ of habeas corpus (ECF No. 1) is **DENIED**.

Further, because Petitioner has failed to make "a substantial showing of the denial of a constitutional right," a certificate of appealability is **DENIED**. 28 U.S.C. § 2253(c)(2).[27]

**IT IS SO ORDERED**.

March 23, 2017                           Joseph F. Anderson, Jr.
Columbia, South Carolina              United States District Judge

---

circumstances, rejecting each one, and found an exception to the no-impeachment rule applies "when a juror's statements indicate that racial animus was a significant motivating factor" to convict a defendant). Moreover, defense counsel stated to the trial judge that the juror's affidavit should only be considered regarding premature deliberations and Petitioner's refusal to take the stand, not to impeach the verdict in this case. ECF No. 8-22 at 127, 150.

[27] A certificate of appealability will not issue absent "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2) (2012). A prisoner satisfies this standard by demonstrating that reasonable jurists would find both that his constitutional claims are debatable and that any dispositive procedural rulings by the district court are also debatable or wrong. *See Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *Rose v. Lee*, 252 F.3d 676, 683–84 (4th Cir. 2001).